IN THE MATTER OF: C.L.B., A.B.B., D.K.B.
No. COA08-647
Court of Appeals of North Carolina.
Filed October 7, 2008
This case not for publication
Jennifer S. O'Connor for Petitioner-Appellee Johnston County Department of Social Services.
North Carolina Administrative Office of the Courts, by Associate Legal Counsel Pamela Newell Williams, for Guardian ad Litem.
Peter Wood for Respondent-Appellant Mother.
Lisa Skinner Lefler for Respondent-Appellant Father.
STEPHENS, Judge.
Respondents appeal from orders terminating their parental rights to their children, C.L.B., A.B.B., and D.K.B. For the reasons stated herein, we affirm the trial court's orders.
Petitioner-Appellee Johnston County Department of Social Services ("DSS") has been involved with Respondents and their children since 2004. That year, DSS substantiated reports of neglect due to Respondents' improper supervision of C.L.B. More recently, in May 2006, DSS found the family to be in need of services. Respondents subsequently entered into an "In Home Service Agreement" in which they agreed to obtain and maintain stable housing, ensure that their children's medical needs were met, complete parenting classes, and complete substance abuse evaluations and comply with recommendations.
In July 2006, Respondent-Father was arrested and jailed for failure to appear on a probation violation. Following Respondent-Father's incarceration, Respondent-Mother placed the children with her mother in Mitchell County. Thereafter, Respondent-Mother was arrested and jailed on 12 August 2006 for failure to appear on a probation violation. Mitchell County officials informed DSS that the maternal grand mother's residence was not an appropriate placement for the children, and DSS filed separate petitions alleging that the children were dependent and neglected. The trial court granted DSS nonsecure custody of the children on 18 August 2006.
By order filed 30 October 2006 and based, in part, on Respondents' consent, the trial court adjudicated the children dependent and neglected. The trial court ordered DSS to continue working with Respondents toward reunification and ordered Respondents to cooperate with DSS's out-of-home services. The trial court conducted a 90-day review hearing on 13 December 2006. On 25 April 2007, the trial court conducted a permanency planning hearing and ordered DSS to continue efforts toward reunification. After conducting a second permanency planning hearing on 8 August 2007, the trial court found that Respondents "ha[d] not made appreciable progress nor demonstrated an ability to correct the conditions that place[d] the juveniles at risk of current and on-going neglect." By order entered 6 September 2007, the trial court changed the permanent plan from reunification to adoption. The trial court maintained the permanent plan as adoption on 3 October 2007.
On 5 November 2007, DSS filed separate petitions to terminate Respondents' parental rights to each child. DSS alleged that grounds existed to terminate Respondents' parental rights based upon neglect, N.C. Gen. Stat. § 7B-1111(a)(1), Respondents' failure to make reasonable progress, N.C. Gen. Stat. § 7B-1111(a)(2), and Respondents' failure to pay a reasonable portion of the children's cost of care, N.C. Gen. Stat. § 7B-1111(a)(3). The trial court concluded that grounds for terminating Respondents' parental rights existed under all three statutory provisions. The trial court further concluded that it was in the children's best interests to terminate Respondents' parental rights. Respondents separately appealed.

I.
Both Respondent-Mother and Respondent-Father contend that the trial court lacked subject matter jurisdiction to enter its orders terminating their parental rights because no summonses were issued to and served upon any of the children. See N.C. Gen. Stat. § 7B-1106(a) (2005); In re K.A.D., ___ N.C. App. ___, ___, 653 S.E.2d 427, 429 (2007) ("When a summons is not properly issued, an order terminating parental rights must be vacated for lack of subject matter jurisdiction.") (citation omitted). We reject this argument.
In all, the record before us contains twelve summonses issued in the proceedings to terminate Respondents' parental rights. For each one of Respondents' children, four summonses were issued. For each child, the four summonses are captioned: "In the Matter of: [the respective child.]" For each child, the four summonses were directed to: (1) Respondent-Mother, (2) Respondent-Father, (3) the Guardian ad litem Attorney Advocate, and (4) the child, respectively. Each person to whom a summons was directed was named as a respondent in the summons. All of the summonses are signed and dated by a deputy clerk of court. Accordingly, all summonses were properly issued. See N.C. Gen. Stat. § 1A-1, Rule 4(a) (2005) ("A summons is issued when, after being filled out and dated, it is signed by the officer having authority to do so.").
However, the record reflects that the summonses issued to the children were not served upon either the children or the children's guardians ad litem. Respondents argue that the failure to serve the children deprived the trial court of subject matter jurisdiction. We disagree. "[S]ervice of summons on the attorney advocate constitutes service on the guardian ad litem. Service of summons on the guardian ad litem, in turn, constitutes service on the juvenile, as expressly stated in N.C. Gen. Stat. § 7B-1106(a)." In re J.A.P., ___ N.C. App. ___, ___, 659 S.E.2d 14, 17 (2008). The Guardian ad litem Attorney Advocate was served with and accepted service of process for all three children. In sum, unlikein K.A.D., where no summons was issued to the minor child, here, summonses were issued to the children and the summonses were accepted on behalf of the minor children by the attorney advocate for the children's guardians ad litem. Accordingly, we conclude that the trial court had subject matter jurisdiction over these proceedings.

II.
Next, Respondent-Father contends that the trial court erred by finding and concluding that sufficient grounds existed to terminate his parental rights. Respondent-Mother makes no such argument on appeal. Preliminarily, although the trial court concluded that grounds existed to terminate Respondent-Father's parental rights pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1), (2) and (3), we note that competent evidence supporting any one of these statutory grounds would enable us to affirm the trial court's order. In re Pierce, 67 N.C. App. 257, 312 S.E.2d 900 (1984).
A court may terminate parental rights upon a finding that a parent "has abused or neglected the juvenile. The juvenile shall be deemed to be abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of G.S. 7B-101 or a neglected juvenile within the meaning of G.S. 7B-101." N.C. Gen. Stat. § 7B-1111(a)(1) (2005). A neglected juvenile is defined in part as "[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent[.]" N.C. Gen. Stat. § 7B-101(15) (2005). To prove neglect in a termination case, there must be clear and convincing evidence that (1) the juvenile is neglected within the meaning of N.C. Gen. Stat. § 7B-101(15), and (2) "the juvenile has sustained `some physical, mental, or emotional impairment . . . or [there is] a substantial risk of such impairment'" as a consequence of the neglect. In re Reyes, 136 N.C. App. 812, 815, 526 S.E.2d 499, 501 (2000) (quoting In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993)).
Although "a prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect[,]" In re Ballard, 311 N.C. 708, 713-14, 319 S.E.2d 227, 231 (1984), "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citation omitted). If the child has been removed from the parents' custody before the termination hearing, and the petitioner presents evidence of prior neglect, including an adjudication of such neglect, then "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." Ballard, 311 N.C. at 715, 319 S.E.2d at 232 (citation omitted). Thus, where
there is no evidence of neglect at the time of the termination proceeding . . . parental rights may nonetheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to her parents.
Reyes, 136 N.C. App. at 815, 526 S.E.2d at 501 (citation omitted). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re D.J.D., 171 N.C. App. 230, 238, 615 S.E.2d 26, 32 (2005) (citation omitted). In the case at bar, the trial court made the following findings of fact in its order terminating both Respondents' parental rights to C.L.B.:
6. [DSS] has had previous involvement with [Respondents], beginning in 2004; that during the 2004 involvement, neglect was substantiated by [DSS] due to improper supervision as the minor child wandered onto a busy road when the father was under the influence of alcohol; that the mother was aware of the father's drinking on that occasion and left the children in his care while she went to the store. The father completed a parenting program during the involvement.
7. In 2005, the minor child was again found wandering in the street at night unsupervised.
8. The most recent involvement between the family and [DSS] began in May of 2006, when the family was found in need of services. The father had disciplined the juvenile's older minor sibling leaving marks and bruising. The family was unable to maintain stable housing, often staying in motels. [Respondents] both acknowledged ongoing use of controlled substances and the juvenile's sibling was able to identify these controlled substances and how to "roll a blunt" and [Respondents] acknowledged using controlled substances in the presence of the juveniles.
9. [Respondents] developed an In Home Service Agreement in June of 2006 whereby they agreed to obtain and maintain stable housing, ensure the juveniles' medical needs were being met, complete substance abuse evaluations and follow any and all recommendations, and complete parenting classes.
10. In July of 2006, [Respondent-Father] was incarcerated in the Johnston County Jail for probation violations. The mother was unable to provide care for the children on her own and she placed the children with her mother . . . in Mitchell County, North Carolina.
11. After the mother placed the children with the maternal grandmother she advised [DSS] of the placement; that Mitchell County DSS was contacted to assess the home . . . for the placement of the children. Mitchell County DSS subsequently informed [DSS] that they would not approve the placement as the home was unsanitary, the children's hygiene was not being addressed as they were found to be dirty and wearing unclean clothing, the maternal grandmother was not addressing the children's behavioral needs and that the maternal grandmother had her own health issues. The children were placed in the home of the maternal grandmother for approximately one week.
12. During the period of time the juvenile and his siblings were residing with the maternal grandmother, the mother was also incarcerated on probation violations. [Respondents] had further been evicted from their home. After being notified that the child's placement in the home of the maternal grandmother was not appropriate, the mother was unable to provide any alternative care arrangements for the child and the child's siblings. A juvenile petition was filed and a [n]on[s]ecure custody order was obtained placing the child and the child's siblings in the custody of . . . DSS.
13. The juvenile's minor female sibling, after removal from the maternal grand mother's home, was hospitalized at Moses Cone Center in Greensboro, North Carolina due to sever[e] tantrums, self injurious behaviors and aggression towards others. Neither [Respondent] sought any treatment for said sibling prior to placement with the maternal grandmother and the Court finds both [Respondents] failed to recognize any mental health needs of the juvenile and the juvenile's sibling. [Respondents] further failed to obtain any treatment or services for the child's speech problems which were noticeable at the time he came into care.
14. The juvenile[] has been diagnosed as having Mixed disturbance of emotions, Developmental Language Disorder, behavior disorder and child neglect. There is concern of Reactive Attachment Disorder. The Court finds from the expert opinion of Cynthia Starling that the child was subjected to neglectful behavior during the first three years of his life, which is the time he resided in the family home under the care of [Respondents]. The juvenile is receiving medication and therapy.
15. The juvenile's older female sibling . . . also has mental health issues, including phonological disorder, Reactive Attachment Disorder, Pervasive Developmental Disorder and child neglect. The sibling also did not receive any services or therapy while in the care of [Respondents] and [Respondents] failed to recognize the juvenile's special needs. The sibling is also receiving medication and therapy with Cynthia Starling. The juvenile's older sibling is also on medication for Attention Deficit Hyperactive Disorder, Oppositional Defiant Disorder and child neglect, however this sibling's mental health issues are not as severe as the other two children.
16. The Adjudication hearing was held on or about October 4, 2006 before the Honorable Resson Faircloth. [Respondents] by and through their counsel consented to an Adjudication of Neglect and Dependency due to their failure and inability to provide proper care and supervision for the juvenile. Furthermore, [Respondents] did not have an appropriate alternative care provider.
17. The Disposition hearing was held on the same date as the Adjudication hearing. Pursuant to the Order of Judge Faircloth, the child remained in the custody of [DSS], with placement in foster care. [Respondents] were ordered to cooperate with [DSS]. The father had been released from the Johnston County Jail having completed his sentence for probation violation. The mother remained incarcerated. A copy of the Adjudication Order and Disposition Order and the accompanying court reports by [DSS] and the GAL were submitted to the court and accepted into evidence without objection.
18. A 90 Day review hearing was scheduled to be heard on or about December 13, 2006 before the Honorable George Murphy. Pursuant to the Order, the juvenile remained in the custody of [DSS] and further ordered that [DSS] continue reunification efforts with [Respondents]. The Court found that an Out of Home Service Agreement had been developed with [Respondents] whereby [Respondents] were referred to the Johnston County Mental Health Center for a substance abuse assessment, and Family Pride for parenting classes. [Respondents] were further asked to maintain stable housing and employment. The mother had been released from jail but was employed at a truck stop. The father had obtained employment as a mechanic. [Respondents] continued to visit with the minor child. . . .
. . . .
20. Another Permanency Planning hearing was scheduled to be held on July 18, 2007 but was continued at the request of counsel for [Respondents]. The matter was rescheduled for July 25, 2007 but was rescheduled again at the request of counsel for [Respondents]. The hearing was subsequently heard on August 8, 2007 before the Honorable A.A. Corbett, Jr. The court, at the conclusion of the hearing, ordered that the juvenile remain in the custody of [DSS], with placement in foster care and relieved [DSS] of further efforts towards reunification with [Respondents]. The Court found that [Respondents] had not made appreciable progress nor demonstrated an ability to correct the conditions that placed the juvenile at a risk of current and ongoing neglect. The Court found that the father had not completed parenting classes. The court further found that although the father had obtained a substance abuse assessment he had failed to follow through with appointments. The Court further found that the father had failed to attend any therapy sessions with Carolina Counseling and had failed to attend meetings regarding the children with the exception of one meeting with Juanita Hammersly. The mother had been terminated from Family Pride parenting for excessive absences and had failed to restart the program. The mother had further failed to begin substance abuse classes and had failed to obtain a substance abuse assessment. The mother had been offered transportation to attend therapy sessions, appointments and family meetings, however she failed to attend. The court found that it was in the child's best interests to change the permanent plan from reunification to adoption. Visitations between [Respondents] and the children were terminated. A copy of the Order and the accompanying court reports from [DSS] and GAL were submitted to the Court and accepted into evidence without objection.
21. Unsupervised visitations occurred between [Respondents] and the minor child from April of 2007 until June of 2007. [Respondents] had an opportunity to visit in July of 2007 but did not do so. The juvenile's behavior, which had begun to stabilize prior to unsupervised visitation, began to deteriorate after beginning said visitation. The juvenile began showing more aggressive behaviors after the visitations and it took longer to get the child back in a normal routine and readjusted after the visitations. The child's older female sibling also demonstrated negative changes in behaviors after visitations . . . . The juvenile's oldest sibling did not display any behaviors, positively or negatively after visitations. The Court finds from the testimony of the social worker, Kellie Stephenson, that the juveniles, who call [Respondents] by their first names, did not show any reluctance to leave a visitation with [Respondents] and that the children did not and have not asked to visit with [Respondents] after the last visitation in June of 2007. The Court finds that since the visitations have stopped, the juvenile's behavior has improved.
22. A Permanency Planning [hearing] was held on September 5, 2007 before the Honorable Resson Faircloth. The court, at the conclusion of the hearing, ordered that the juvenile remain in the custody of [DSS], with placement in foster care and continued to relieve [DSS] of further efforts towards reunification with [Respondents]. Visitations continued to be terminated with [Respondents]. A copy of the Order and accompanying court reports by [DSS] and GAL were submitted to the Court and accepted into evidence without objection.
23. The father began parenting classes in November of 2006, however was terminated due to lack of attendance. The Court finds the father restarted the parenting program in late June of 2007 after being advised of the recommendations of [DSS] to change the child's plan to adoption. The Court finds that the father has restarted the parenting program on at least six occasions since 2005. The father completed the parenting classes one week prior to this hearing however has not yet completed the entire program. The Court finds that the father had previously completed a parenting program, however [DSS] became involved with the family again due to parenting issues thus not demonstrating knowledge gained from these classes.
. . . .
26. The father completed a substance abuse assessment in November of 2006 but did not follow the recommendations for treatment until he enrolled in substance abuse classes in June of 2007, after being advised of the [DSS] recommendation to change the child's plan to adoption. The father refused a request to submit to a random drug screen in July of 2007 and tested positive in August of 2007 after having attended substance abuse classes.
27. [Respondents] were asked in June of 2006 to obtain speech therapy for the child's female sibling, [] however they failed to do so prior to the child's placement in foster care and [Respondents] failed to recognize any concern with this child's speech and did not seek any services. The child was subsequently diagnosed as having Phonological disorder. [Respondents] were repeatedly asked and encouraged to attend meetings and therapy with Cynthia Starling, the child's therapist concerning the diagnosis[] and treatment of this child, however they failed to do so until after being made aware of the recommendations of [DSS] to change the child's permanent plan. [Respondents] further failed to attend treatment team meetings with Juanita Hammersly concerning the child's sibling . . . and her mental health and behavioral needs although repeatedly encouraged to do so, even after [DSS] was relieved of further efforts towards reunification.
28. Ms. Cynthia Starling scheduled meetings with [Respondents] to discuss this child and his siblings' behavior problems and emotional needs and to gather information about their past so Ms. Starling could better understand and work with the children, on April 4, 2007, May 29, 2007 and June 13, 2007 but [Respondents] did not attend. The mother attended two meetings on June 20, 2007 and June 27, 2007 however the father failed to attend. Another appointment was scheduled for July 17, 2007 to meet with both [Respondents] but [Respondents] failed to attend.
. . . .
30. The Court finds that during the meetings with Ms. Starling that [Respondents] did attend, neither recognized the extent of problems and issues that each of the children were experiencing. Furthermore, the mother did not believe that the child required medication although said medication was prescribed by mental health professionals. [Respondents] still failed to understand the needs and treatment for their children and the court finds that [Respondents] continue as of this date not to have an understanding of each child's diagnosis and needs, which would place the children at risk of harm if returned to [Respondents'] care. The Court finds that although the father testified that they intended to learn more about each child's diagnosis, they have failed to do so in the past fifteen months although provided ample opportunity to do so. The Court further finds that if [Respondents] had attended the treatment team meetings and individual meetings, they could have learned more about the children's diagnos[e]s and needs.
31. The Court finds that both Ms. Starling and Ms. Hammersly, a Qualified Mental Health Professional providing services to [C.L.B.'s sibling] testified that they would be concerned for the child if the child returned to [Respondents'] custody or care due to [Respondents'] lack of understanding of the child's needs and would further be concerned, based upon [Respondents'] pattern of failing to follow through with services for the child's sibling and this child while the children were in the home as well as failing to attend appointments concerning the child, that the child would not continue to receive the necessary ongoing treatment. The Court further finds that [Respondents] continue to blame others and further fail to accept responsibility for their current situation and the situation of that of their child. The Court further finds that [Respondents] further fail to recognize that the cause of the child's diagnosis was the care he received during the first three years of his life, when he was under the care, custody and control of [Respondents].
32. The Court finds that although [Respondents] testified that they were unable to attend various classes, appointments and meetings in this matter due to transportation issues, they have demonstrated an ability to secure transportation to meet their own needs, including but not limited to taking taxi cabs and utilizing friends. The Court further finds that [Respondents] live within walking distance to [DSS] but failed to attend meetings concerning their children at that agency. The Court further finds that various social workers involved in this matter had offered transportation or transportation services to [Respondents] but they did not use these services. The Court further finds that [Respondents] both have lost their driver's licenses due to their own misconduct and currently are not eligible to obtain their licenses due to failing to appear in court and failing to pay off fines. [Respondents] continue to be cited for driving without a license.
. . . .
37. The Court finds that [DSS] has been involved with the family consistently since 2006, with prior involvement dating back to 2004. The Court further finds from the evidence presented that since the agency's involvement, [Respondents] have been unable to demonstrate an ability to maintain a home free from protective issues, even after attending numerous programs and groups to resolve said issues. [Respondents] have been unable to demonstrate the ability to consistently address not only their children's issues, but [their] own parenting and substance abuse issues and have further failed to demonstrate the commitment to do so, particularly on a long term basis.
38. The court finds as a fact that [Respondents] have not successfully addressed any of the issues, which led to the juvenile's removal, which would prevent future neglect if the child were returned to their care. The court has considered evidence of changed conditions and determines that while the father has completed the programs requested of him one week prior to this hearing, including but not limited to parenting classes, he previously completed a parenting program only to have [DSS] again become involved with the family and the subsequent removal of the child from the home. The mother has not completed the programs or services requested of her to resolve the protective issues in the home. [Respondents] believe that there were no problems in the home or in their parenting skills prior to removal of the juvenile and his siblings. The court finds that the changed conditions, taken in light of [Respondents'] history of neglect, does not deflect the high probability of future neglect if the juvenile was returned to either [Respondent's] care. The court further finds that neither [Respondent] is fit at the time of this Termination of Parental Rights hearing to parent the minor child. The court further finds that most of the conditions that occurred at the time of the removal have not been successfully resolved as of this date.
. . . .
41. The court finds by clear, cogent and convincing evidence that grounds for termination of parental rights exist in that the juvenile has been neglected by [Respondents], pursuant to N.C.G.S. 7B-1111(a)(1) . . . .
Primarily on these findings, the trial court concluded that grounds existed to terminate Respondent-Father's parental rights to C.L.B. On substantially similar, often verbatim findings, the trial court also concluded that grounds existed to terminate Respondent-Father's parental rights to A.B.B. and D.K.B. Although Respondent-Father assigned error to several of the court's findings, he failed to specifically argue in his brief that the findings are not supported by the evidence. Consequently, Respondent-Father has abandoned those assignments of error, and these findings are deemed binding on appeal. See, e.g., In re P.M., 169 N.C. App. 423, 424, 610 S.E.2d 403, 404 (2005) (concluding respondent had abandoned factual assignments of error when she "failed to specifically argue in her brief that they were unsupported by evidence"). Out of an abundance of caution, however, we have reviewed the evidence in the record before us and we conclude that the findings to which Respondent-Father assigned error are supported by competent evidence.
Respondent-Father argues that the trial court ignored his "progress on working the case plan" and, therefore, erred in concluding there was the probability of a repetition of neglect. The trial court's findings, however, support the conclusion that the children are neglected. The trial court found that Respondent-Father had completed the parenting classes, but that he had completed them one week before the termination hearing. The trial court found that Respondent-Father had completed parenting classes in 2004, but that he had still demonstrated poor parenting which eventually resulted in the removal of the children from his care. The trial court found that Respondent-Father had enrolled in substance abuse classes, but did so only after learning that DSS recommended changing the permanent plan to adoption. The trial court found that despite enrolling in substance abuse classes in June 2007, Respondent-Father tested positive in August 2007. Finally, the trial court found that Respondent-Father did not understand his children's needs and failed to follow through with services for his children.
The evidence that there was a probability of a repetition of neglect included Respondent-Father's pattern of drug abuse, his failure to demonstrate the knowledge he gained from the parenting classes, and his refusal to recognize the children's needs. We, therefore, conclude that clear, cogent, and convincing evidence supports the trial court's findings that C.L.B., A.B.B., and D.K.B. had been subjected to a history of neglect and were likely to be similarly neglected in the future. We further conclude that the court's findings of fact support its conclusions that grounds existed to terminate Respondent-Father's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1). See, e.g., In re Davis, 116 N.C. App.409, 414, 448 S.E.2d 303, 306 (concluding that parents' failure to "obtain[] continued counseling, a stable home, stable employment, and parenting classes" was sufficient to show a probability that neglect would be repeated if the child were returned to the care of the parents), disc. review denied, 338 N.C. 516, 452 S.E.2d 808 (1994); In re Johnson, 70 N.C. App. 383, 320 S.E.2d 301 (1984) (finding evidence of neglect in parents' improper care during children's trial placement with mother, failure to make lifestyle changes, and sporadic attendance at counseling sessions). The assignments of error upon which Respondent-Father's argument is based are overruled.

III.
Finally, Respondents argue that the trial court abused its discretion in concluding that the termination of their parental rights was in the children's best interests.
In determining whether terminating parental rights is in a juvenile's best interest, the court shall consider the following:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110(a) (2005).
Whether termination is in the best interests of the child is discretionary, and a court may decline to terminate parental rights only "where there is reasonable hope that the family unit within a reasonable period of time can reunite and provide for the emotional and physical welfare of the child."
D.J.D., 171 N.C. App. at 239, 615 S.E.2d at 32 (quoting In re Blackburn, 142 N.C. App. 607, 613, 543 S.E.2d 906, 910 (2001)).
Here, the trial court's findings of fact support its determination that it was in the children's best interests to terminate Respondents' parental rights. As to C.L.B., the trial court found:
45. The Court further finds as a fact, pursuant to the testimony provided and the Court report of the Guardian ad Litem volunteer which was presented to the Court and accepted into evidence during the dispositional phase of this hearing without objection, that it is in the child's best interest that the parental rights of [Respondents] be terminated as the juvenile has made great progress while in foster care. The Court further finds that it is . . . the child's therapist, Ms. Cynthia Starling's opinion that it is not in the child's best interest to return home. The juvenile is receiving the treatment and services he needs which he did not receive while in the care of [Respondents], including but not limited to speech therapy, counseling and psychiatric services. The juvenile has improved in his behaviors with regards to aggression. The juvenile is attending day care and school without any problems. The juvenile, who did not have stability while in the care of [Respondents] has achieved after being removed from their care.
[46]. The court finds pursuant to N.C.G.S. § 7B-1110, that the juvenile is approximately five years old. The Court finds that a possible adoptive placement has been located for the juvenile, which is the same placement as his older brother, and there is a likelihood that the juvenile will be adopted. The Court further finds that termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile. The Court finds that the child has not demonstrated a bond with [Respondents] as demonstrated by the child referring [to] [Respondents] by their first names and further by his behavior and problems during visitations with [Respondents] and improvement of same after visitations were terminated. The juvenile is bonded with the identified prospective adoptive parents. The court finds that it is the opinion of both the social worker, Kellie Stephenson[,] and the Guardian ad Litem Volunteer, Sheila Pate, based upon their experience and interaction with the child[,] that the parental rights in and to the child should be terminated as the child is in need of permanence that he cannot receive from either [Respondent]. The juvenile is in need of stability in a safe, stable and nurturing environment, with proper care and supervision which can be obtained through adoption.
As to A.B.B., the court found:
45. The Court finds as a fact, pursuant to the testimony provided and the Court report of the Guardian ad Litem volunteer which was presented to the Court and accepted into evidence during the dispositional phase of this hearing without objection, that it is in the child's best interest that the parental rights of [Respondents] be terminated as the juvenile has made great progress while in foster care. The Court further finds that it is . . . the child's therapist, Ms. Cynthia Starling's opinion that it is not in the child's best interest to return home. The juvenile is receiving the treatment and services she needs which she did not receive while in the care of [Respondents], including but not limited to speech therapy, counseling and psychiatric services. The juvenile has improved in her behaviors with regards to day care and school. The Court acknowledges that the child recently had a set[]back with regards to her behaviors, however prior to that setback she had been stabilized for an extended period of time, particularly after visitations with [Respondents] ceased. In addition, the juvenile is no longer demonstrating sexualized behaviors since the visitations have ceased.
[46]. The court further finds pursuant to N.C.G.S. 7B-1110, that the juvenile is approximately six years old. The Court finds that a possible adoptive placement has been located for the juvenile and there is a likelihood that the juvenile will be adopted with further therapeutic intervention. The Court further finds that termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile. The Court finds that the child has not demonstrated a bond with [Respondents] as demonstrated by the child referring [to] [Respondents] by their first names and further by her behavior and problems during visitations with [Respondents] and improvement of same after visitations were terminated. The juvenile is bonded with the identified prospective adoptive parents. The court finds that it is the opinion of both the social worker, Kellie Stephenson[,] and the Guardian ad Litem Volunteer, Sheila Pate, based upon their experience and interaction with the child[,] that the parental rights in and to the child should be terminated as the child is in need of permanence that she cannot receive from either [Respondent]. The juvenile is in need of stability in a safe, stable and nurturing environment, with proper care and supervision which can be obtained through adoption.
As to D.K.B., the court found:
45. The Court further finds as a fact, pursuant to the testimony provided and the Court report of the Guardian ad Litem volunteer which was presented to the Court and accepted into evidence during the dispositional phase of this hearing without objection, that it is in the child's best interest that the parental rights of [Respondents] be terminated as the juvenile has made great progress while in foster care. The Court further finds that it is . . . the child's therapist, Ms. Cynthia Starling's opinion that it is not in the child's best interest to return home. The juvenile has been main streamed into a regular classroom at school during this academic school year. The juvenile has improved in his self control and listening skills but continues to demonstrate parental behavior concerning his younger sibling. The juvenile is receiving the treatment and services he needs which he did not receive while in the care of [Respondents], including but not limited to counseling and psychiatric services. The juvenile, who did not have stability while in the care of [Respondents] has achieved after being removed from their care.
[46]. The court finds pursuant to N.C.G.S. 7B-1110, that the juvenile is approximately nine years old. The Court finds that a possible adoptive placement has been located for the juvenile, which is the same placement as his younger brother, and there is a likelihood that the juvenile will be adopted. The Court further finds that termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile. The Court finds that the child has previously demonstrated a bond with [Respondents], particularly his father. The juvenile initially expressed a desire to return home, however, is now talking positively about being adopted. [D.K.B.] has expressed that he does not believe he will return home and that he wants to remain in his foster home. The juvenile is bonded with the identified prospective adoptive parents. The court finds that it is the opinion of both the social worker, Kellie Stephenson[,] and the Guardian ad Litem Volunteer, Sheila Pate, based upon their experience and interaction with the child[,] that the parental rights in and to the child should be terminated as the child is in need of permanence that he cannot receive from either [Respondent]. The juvenile is in need of stability in a safe, stable and nurturing environment, with proper care and supervision which can be obtained through adoption.
A review of the record reveals that the trial court's findings are supported by competent evidence, including the guardian ad litem court reports and testimony from Kellie Stephenson. Based upon the trial court's findings, which reflect a rational reasoning process, we conclude that the trial court did not abuse its discretion in its determination that terminating Respondents' parental rights was in the children's best interests.
The trial court's orders terminating Respondents' parental rights are affirmed.
AFFIRMED.
Judges McCULLOUGH and JACKSON concur.
Report per Rule 30(e).